```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DENISE PIERCE,                 )
                               )
          Plaintiff,           )
                               )
     v.                        )   Civil Action No. 04-1005
                               )
JO ANNE BARNHART,              )   Judge McVerry
                               )   Magistrate Judge Hay
          Defendant.           )
```

AMENDED REPORT AND RECOMMENDATION

I.   RECOMMENDATION

It is respectfully submitted that the Motion for Summary Judgment filed by Plaintiff [dkt. no. 7] be denied. It is further recommended that the Motion for Summary Judgment filed by the Defendant [dkt. no. 9] be granted and that the decision of the Commissioner denying Plaintiff's application for disability insurance benefits and supplemental security income be affirmed.

II.  REPORT

   A.   Procedural History

Plaintiff Denise Pierce brought this action under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claims for disability insurance benefits ("DIB") under title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-433, and for Supplemental Security Income ("SSI") under title XVI of the Act, 42 U.S.C. §§ 1381-1383f.

In her application filed on September 24, 2001, with a protective filing date of August 17, 2001, Ms. Pierce alleges that she has been disabled since December 1, 1999, due to multiple sclerosis, blurred vision and migraine headaches[1] (Tr. 128-29, 173, 810-14).  Her claim was denied initially (Tr. 815-19).  Thereafter, Ms. Pierce requested a hearing before an Administrative Law Judge ("ALJ").

The case was heard before an ALJ on November 22, 2002 (Tr. 21-32).  The ALJ heard testimony from Ms. Pierce, who was represented by counsel (Tr. 39-55), and from a vocational expert, Eugene Czuczman (Tr. 68-82).  As well, Earl Root, the claimant's boyfriend, and Francis Werner, a family friend, appeared and testified (Tr. 55-66).  The ALJ concluded in a decision dated April 22, 2003, that Ms. Pierce retained the ability to perform certain work activity at the sedentary level and, thus, was not "disabled" within the meaning of the Act (Tr. 31, Finding Nos. 11-13).

Ms. Pierce  requested review of the ALJ's decision by the Appeals Council (Tr. 11).  The Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 8-10).  The decision of the ALJ thus became the Commissioner's final decision for purposes of this judicial review.

---

[1] Plaintiff filed a prior application for SSI on October 13, 1998 (Tr. 129-30).  As noted in the ALJ's decision, Plaintiff did not appeal the April 29, 1999 reconsideration determination on that claim (Tr. 84).

**B.   Factual Background**

Ms. Pierce was born on December 6, 1963, and was thirty-nine years old at the time of the ALJ's decision (Tr. 39). At the time of the hearing, Ms. Pierce resided in Clarksburg, Pennsylvania (Tr. 39). Ms. Pierce completed fourteen grades of formal schooling, having earned an Associate's Degree in computer programming (Tr. 39). Her past work experience includes work as a computer programer, data processing supervisor and bartender (Tr. 41-42). Plaintiff worked on a part-time basis as a bartender between August 18, 2000 and July 13, 2002,[2] after the alleged onset of her disability (Tr. 61).

**C.   Medical History**

Ms. Pierce has a fairly complex medical history and has been examined by multiple specialists between 1998 and 2002.[3] She testified that her doctors had told her that she had a condition resembling multiple sclerosis ("MS")[4] (Tr. 44-45). In

---

[2]   Plaintiff's Social Security Earnings Record shows reported gross wages of $5,998 during 2000 and $2,980 during 2001 (Tr. 160). The ALJ found that Plaintiff's part-time bartending work was not "substantial gainful activity," at the first step of the sequential evaluation process (Tr. 31).

[3]   The ALJ noted that only evidence dated subsequent to April 23, 1999 – the date Ms. Pierce's prior SSI application was finally denied – was being emphasized in his decision but that all of the medical evidence had been reviewed to provide a "longitudinal picture" (Tr. 24).

[4]   MS is a disease of uncertain etiology which affects the central nervous system. In MS, fatty tissue called myelinis, which helps nerve fibers conduct electrical impulses, is lost in multiple areas, leaving scar tissue called sclerosis. See http://www.nationalmssociety.org/brochures-on%20diagnosis.asp

June 1998, she was admitted to the University of Pittsburgh Hospital for evaluation of severe recurrent headaches and blurred vision, thought to be associated with some type of demyelinating process (Tr. 668). Her July 1998 brain MRI showed a single plaque/lesion, which was suspicious for multiple sclerosis, but the MRI findings were inconclusive (Tr. 262).

    In August 1998, Dr. Rock Heyman, a neurologist at the University of Pittsburgh, conducted a consultative neurological examination (Tr. 364). He thought that Ms. Pierce had experienced an episode of acute disseminated encephalomyelitis ("ADE"),[5] but without any history of prior infection or immunization (Tr. 365). He stated that Ms. Pierce might be at risk for developing multiple sclerosis, but that her symptom history was not compatible with MS (Tr. 365). He recommended that she use a larger computer screen while working as a computer programer, and that she undergo an eye examination (Tr. 365). He also prescribed the anti-depressant Amitriptyline for her headaches (Tr. 366). Ms. Pierce's subsequent eye examination showed 20/20 correctable vision in both eyes, and essentially normal visual fields (Tr. 307).

---

[5] ADE is a neurological disorder characterized by inflammation of the brain and spinal cord, caused by damage to the myelin sheath. ADE may develop following a viral or bacterial infection, as a complication of inoculation or vaccination, or without a preceding cause. ADE is symptomatically treated with corticosteroids. Some patients achieve complete recovery, others may have residual deficits. http://www.ninds.nih.gov/disorders/acute_encephalomyelitis/acute_encephalomyelitis.htm

In September 1998, Ms. Pierce underwent median somatosensory and visual evoked potentials testing[6] to further investigate the potential diagnosis of MS, and the results were within normal limits (Tr. 315, 332, 357-59).

During an October 1998 follow-up examination, Dr. Heyman ordered magnetic resonance angiograms and venograms to investigate Ms. Pierce's headaches, and these tests were normal (Tr. 332). Her neurological examination was normal in every respect (Tr. 332). More specifically, Ms. Pierce denied any symptoms of numbness, weakness, parasthesias, hearing loss or vertigo (Tr. 333). Dr. Heyman recommended that she begin Prozac and use Vicodin only as needed to assist her sleep (Tr. 333).

In February 1999, Dr. Elliot Michel, a Board-certified neurologist and sleep specialist, evaluated Ms. Pierce at the request of the Commissioner (Tr. 372). Ms. Pierce complained of pressure-type headaches and blurry vision "24 hours a day, 7 days per week" since July 6, 1998 (Tr. 372-73). He noted that she was followed by Dr. Heyman, with a diagnosis of migraines, and consuming Hydrocodone and Ambien, a sleep aide (Tr. 372). Dr. Michel noted that Ms. Pierce's visual fields and neurological examination were intact (Tr. 273). Her recall was excellent and

---

[6]  Evoked potential ("EP") tests are electrical diagnostic studies that can show if there is a slowing of messages in various parts of the brain. They often provide evidence of scarring along nerve pathways not apparent any other way. http://www.nationalmssociety.org/Sourcebook-Evoked.asp

her mental status was normal, although she complained of concentration difficulties due to headaches and visual problems (Tr. 373). Dr. Michel's impression was vascular headaches, with probable underlying cerebral vasculitis[7] (Tr. 373). He completed a medical assessment which did not limit Ms. Pierce's ability to sit, stand or walk during an 8-hour work day, except that her ability to see was affected by her complaints of blurred vision (Tr. 375-76).

Ms. Pierce's repeat brain MRI, in September 2000, was unchanged since the previous study (Tr. 408). Dr. Williamson, the neurologist who interpreted the study, advised Dr. Alan McGaughran, Ms. Pierce's family practitioner, that because she was currently asymptomatic, nothing further needed to be done (Tr. 408, 410).

In October 2001, Ms. Pierce saw another neurologist, Dr. Stephan Gelfand, and her repeat brain MRI remained unchanged (Tr. 634-40).

In November 2002, Dr. McGaughran responded to an inquiry by Ms. Pierce's counsel, reporting that Dr. Williamson believed that Ms. Pierce's headaches were tension headaches, and that her blurred vision was "more of a stress complaint" (Tr. 669). Dr. McGaughran also noted that there was consensus that

---

[7] Cerebral vasculitis is a disorder involving inflammation and damage to blood vessels, most commonly the blood vessels of the head, particularly the arteries that branch from the carotid artery. http://www.healthcentral.com/mhc/top/000448.cfm

Ms. Pierce should taper and minimize her use of narcotic medication, and seek narcotic medication only though him (Tr. 669).[8] He admitted that she had frequently visited the emergency room when she ran out of pain medications; her treating physicians had sought to limit her monthly consumption of narcotic pain medication[9] (Tr. 670). Nonetheless, he described Ms. Pierce's headaches as manageable on her current medical regimen (Tr. 671-72). He stated that she experienced right-sided weakness and easy fatigability, which would "[c]ertainly impact her ability to perform even light duty jobs that would be full-time" (Tr. 672).

In December 2002, psychologist Dennis Kreinbrook, Ph.D., evaluated Ms. Pierce at the request of her attorney (Tr. 654). His testing revealed that she had average intelligence and that she was moderately depressed (Tr. 654-57). He rated her GAF at 55, which denotes moderate symptoms[10] (Tr. 658).

---

[8]  A concern over limiting Ms. Pierce's narcotic use is also reflected earlier, in Latrobe Hospital notes of October 13, 2000 (Tr. 755).

[9]  The ALJ noted that Plaintiff had visited the Latrobe Hospital emergency room on 50 occasions over a three-year period, with complaints of migraine headaches (Tr. 27, 424-658).

[10]  The Global Assessment of Functioning Scale (GAF scale) considers psychological, social, and occupational functioning on a hypothetical continuum of mental health - illness. The highest possible score is 100; the lowest, 1. GAF scores from 51 to 60 denote moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with co-workers). Diagnostic and Statistical Manual of Mental Disorders,(DSM IV), at 32-34 (American Psychiatric

### C.  Hearing Testimony and ALJ Decision

As noted, Ms. Pierce worked as a bartender after the alleged onset of her disability. The bar owner, Francis Werner, who is also a family friend, testified at the hearing that Ms. Pierce usually worked two or three days per week, and was initially scheduled to work 8 to 12 hours per day (Tr. 61). He stated that there were periods when she was very reliable, and other times when she would call-in sick for one or more days per week (Tr. 62). He related that Ms. Pierce's hours were eventually reduced, and that she would typically work 5 or 6 hours per day (Tr. 63). He stated that he assigned her to work at a bar that was not fast-paced, and that she had a chair to sit in when not serving customers (Tr. 63). He also stated that Ms. Pierce was clumsy, had difficulty operating a cash register, and was prohibited from stocking the bar shelves (Tr. 59, 63-64).

At the hearing, Ms. Pierce testified that she shares housework (cooking, cleaning and laundry) equally with her seventy-two year-old mother (Tr. 43). Ms. Pierce indicated that she tires easily and has weakness in her arms and legs, on both sides of her body (Tr. 48-49).[11] She indicated an inability to hold onto objects once in her grasp (Tr. 49) and to walk farther than one block (Tr. 53).

---

Association, Task Force on DSM-IV (4th ed. (Text Revised) 2000).

[11]  This court was unable to locate in the voluminous record or in Ms. Pierce's brief, any medical finding of or reference to a left-sided deficit.

The ALJ found that Ms. Pierce's statements concerning her inability to sustain any level of activity were not entirely credible in light of the medical evidence (Tr. 31 Finding No. 4).

The ALJ subsequently determined that (1) Ms. Pierce had not engaged in substantial gainful activity subsequent to her alleged onset date and in particular, that her employment as a bartender did not constitute substantial gainful activity (Tr. 25, 31 Finding No. 2); (2) Ms. Pierce has severe impairments, that is, multiple sclerosis, migraine headaches, and depression (Tr. 25, 31 Finding No. 3); (3) none of her impairments nor a combination thereof met the Listings (Tr. 25, 31 Finding No. 3); (4) Ms. Pierce has the residual functional capacity (RFC) to perform the physical exertions of work except for occasionally lifting or carrying more than ten pounds, frequently lifting or carrying more than lesser weights such as dockets and files, or standing and walking for more than one-third of an eight-hour work day (Tr. 29, 31 Finding No. 5); and (5) Ms. Pierce is limited to less than the full range of sedentary work (Tr. 30, 31-32 Finding No. 12).

The ALJ questioned Eugene Czuczman, the vocational expert (VE), concerning whether there were a significant number of jobs in the economy that Ms. Pierce could perform given her medically-determinable impairments (Tr. 319). The VE classified Plaintiff's past occupations as semi-skilled and skilled work, with light and sedentary exertional demands (Tr. 67-68). The ALJ

posed a hypothetical to the VE of a worker with Ms. Pierce's educational and vocational background, who was limited to light and sedentary exertional work (Tr. 70-71).  He also specified that the worker (1) was limited in her ability to work at heights or near dangerous machinery; (2) needed to avoid concentrated exposure to temperature extremes, humidity and dampness; (3) was limited to simple tasks involving one and two step tasks, without detailed or complex instructions, and was limited to (4) no interaction with the general public and no more than occasional interaction with co-workers (Tr. 70-72).  The VE named the representative sedentary occupations of patcher, document preparer, and type copy examiner (Tr. 72).  These occupations represent hundreds of jobs in the region and hundreds of thousands of jobs in the national economy (Tr. 72).

Because of Ms. Pierce's complaints of right-sided weakness, the ALJ further questioned the vocational expert concerning the degree of manual dexterity required for the various identified occupations (Tr. 72).  The VE indicated that the occupation of patcher would require occasional to frequent bilateral grasping (Tr. 72).  He stated that document preparer would require occasional grasping bilaterally, but could be performed unilaterally (Tr. 72).  As well, the type copy examiner position would require occasional grasping but could be accomplished with the use of one hand (Tr. 72).  Additionally, the VE admitted that the identified occupations required

attendance 5 days per week, and that the worker would be expected to be productive for at least 45 minutes out of every hour during the work day (Tr. 74).

The ALJ concluded at the fifth step in the sequential evaluation that Ms. Pierce was not disabled.

### D. Standard of Review

In reviewing the administrative determination by the Commissioner, the question before the court is whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987). Substantial evidence is defined as less than a preponderance and more than a mere scintilla. Perales, 402 U.S. at 402. "Overall, this [substantial evidence] test is deferential, and we grant similar deference to agency inferences from facts if those inferences are supported by substantial evidence, even [where] this court . . . might have reached a different conclusion." Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986)(internal quotations and citations omitted). Accordingly, if supported by substantial evidence, the Commissioner's decision must be affirmed. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

A five-step process is used to determine disability eligibility, see 20 C.F.R. § 404.1520.[12]  Here, the ALJ resolved the issue at the fifth step.  At the fifth step, the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity,[13] age, education, and past work experience, she can perform work that exists in significant numbers in the regional or national economy.  42 U.S.C. § 423(d)(2)(A); see also Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

### E. Discussion

Ms. Pierce argues that the ALJ's decision is not supported by substantial evidence.  She complains that the ALJ's determination that although she could not perform her past relevant work, she still had the capacity to work as a patcher, type copy examiner and a document preparer is contradicted by the evidence.  She also claims that the ALJ failed to consider testimony given by the VE and by Ms. Pierce's former employer concerning her limitations in the workplace.  Lastly, she argues

---

[12]  The five-step sequential evaluation process for disability claims requires the Commissioner to consider whether a claimant: (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his past relevant work, and (5) if not, whether he can perform any other work in the national economy.  20 C.F.R. §§ 404.1520, 416.920.

[13]  A claimant's "residual functional capacity" is what he can do despite the limitations caused by his impairments. Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001).

that the ALJ erred by disregarding the opinions of her treating physicians regarding her limitations.

In our view, there is substantial evidence in the record to support the ALJ's conclusion that Ms. Pierce is capable of a limited range of sedentary work.

First, the record reflects that Ms. Pierce worked, at least on a part-time basis, as a bartender after the alleged onset date of her disability (Tr. 61). Bartending is considered light exertional duty work (Tr. 68). She worked at this job until July 13, 2002, approximately four months prior to her hearing before the ALJ, despite experiencing migraines and with certain accommodations from her employer (Tr. 60-64). As the Commissioner points out, the fact that Ms. Pierce received certain accommodations, such as the ability to sit occasionally, or not being required to stock shelves, does not demonstrate that she is incapable of the lesser physical demands of sedentary work.

Next, and contrary to her assertion, it appears that the ALJ properly credited Ms. Pierce's complaints of pain and fatigue. The ALJ recognized that Ms. Pierce could not perform her past occupations, that she had significant exertional and non-exertional limitations, and that she could do no more than a limited amount of sedentary activity (Tr. 29). In reaching his decision, the ALJ considered Ms. Pierce's testimony regarding her daily activities (Tr. 29). As Ms. Pierce correctly notes,

13

sporadic and transitory activity is not "substantial gainful activity."  20 C.F.R. §§ 404.1572(c) and 416.972(c)(SSA "does not consider activities such as self-maintenance, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity.").  Daily activities are, however, one of the factors that an ALJ can consider in evaluating the credibility of subjective complaints of pain and fatigue.  See 20 C.F.R. §§ 404.1529(c)(3)(I), 416.929(c)(3)(I).  Here, the ALJ credited Ms. Pierce's complaints of pain and fatigue but not the degree of limitation she professed they produced, given her other testimony concerning the level of her daily activities.  Further, the ALJ did not rely solely upon Ms. Pierce's admissions that she could, for example, walk one block, lift a 25 pound bag of dog food, or share the household responsibilities with her 72 year old mother (Tr. 26).  The ALJ also discussed the relevant medical opinion evidence and examination findings (Tr. 26-27).

The treating physician, Dr. McGaughran, responding to an inquiry by Ms. Pierce's counsel, reported that as of her last visit on October 21, 2002, Ms. Pierce's headaches were unresolved but manageable on her current medical regimen (Tr. 671).  He stated that Ms. Pierce experienced chronic right-sided weakness and easy fatigability, which would "[c]ertainly impact her ability to perform even light duty jobs that would be full-time" (Tr. 672).  Dr. McGaughran did not address Ms. Pierce's ability

14

to engage in work of a sedentary nature.  Moreover, the finding of disability under the Act is a legal determination to be made by the ALJ.  20 C.F.R. §§ 404.1527(e), 416.927(e).

Similarly, the ALJ considered Dr. Catalano's records of treatment (Tr. 27-28).  He last examined Ms. Pierce on October 22, 2002.  His reported findings were generally unremarkable; he did note normal speech and unchanged headaches (Tr. 802).  Nevertheless, Dr. Catalano opined that Ms. Pierce was "presently disabled" with a "guarded" prognosis (Tr. 803-04).  The precise basis for this opinion of disability is not reflected in the record.

Ms. Pierce argues that the ALJ disregarded the opinions of her treating physicians and substituted his opinion for theirs.  The record does not support this argument.  The ALJ did not reject the physicians' diagnoses and attendant limitations.  He noted that by history, her conditions, while chronic, were not static.  Nevertheless, the ALJ found that because of her physical limitations Ms. Pierce could not do her past work (Tr. 26-29, 31).  Additionally, the ALJ incorporated her limitations into the hypothetical posed to the VE (Tr. 70-72).  In particular, the ALJ questioned the VE concerning the degree of manual dexterity required for the various occupations he had identified that Ms. Pierce had the capacity to perform (Tr. 72).  The vocational expert stated that the occupation of patcher would require occasional to frequent bilateral grasping (Tr. 72).  He stated

that document preparer would also require occasional grasping bilaterally, but could be performed unilaterally (Tr. 72). As well, the occupation of type copy examiner would require occasional grasping which could be performed with one hand (Tr. 72). The issue of how Ms. Pierce's dexterity affects her ability to work was addressed by the vocational expert, as directed by Social Security Ruling (SSR) 83-14 . See, e.g. Henderson v. Social Security Admin., 87 Fed. Appx. 248, 2004 WL 75380 (3d Cir 2004)(Table, text in WESTLAW)("We shall not interpret SSR 83-12[14] to mandate reversal whenever the ALJ does not set out specific findings concerning the erosion of the occupational base if, as here, the ALJ has received the assistance of a vocational expert in considering the more precise question whether there are a significant number of jobs in the economy that the claimant can perform"). There is no evidence that Ms. Pierce lacks the ability to grasp occasionally and her own testimony demonstrates that she can grasp at least occasionally. Ms. Pierce presented no medical findings or opinion evidence substantiating that she lacks bilateral manual dexterity. In any event, the vocational expert considered these factors when identifying suitable jobs.

---

[14]   As the Commissioner points out, SSR 82-12, similar to SSR 83-14, addresses the implications of a limitation to work allowing a sit/stand option. As the ALJ did in this case, the ruling suggests that assistance from a vocational expert is helpful in deciding whether alternative work exists in significant numbers in the economy.

Contrary to Ms. Pierce's argument, the ALJ did not reject the treating physicians' diagnoses and attendant limitations, only their conclusions that Ms. Pierce cannot work. This is not a case where the ALJ failed to mention or explain or refute contradictory medical evidence before him. See, e.g., Burnett v. Commissioner, 220 F.3d 112, 121 (3d Cir. 2000); Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994).

Disability is defined as follows:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The statement by a treating physician that the plaintiff is "disabled" or "unable to work" is not dispositive of the issue of disability. See Adorno, 40 F.3d at 46. The ultimate decision regarding disability belongs to the ALJ and not Drs. McGaughran and Catalano. 20 C.F.R. §§ 404.1527(e), 416.927(e).

Summary judgment is appropriate when there are no disputed material issues of fact, and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56; <u>Edelman v. Commissioner of Social Sec.</u>, 83 F.3d 68, 70 (3d Cir. 1996).  In the instant case, there are no material factual issues in dispute, and it appears that the ALJ's conclusion is supported by substantial evidence.  For this reason, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that the decision of the Commissioner be affirmed.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report.  Any party opposing the objections shall have seven (7) days from the date of service of the objections to respond thereto.  Failure to timely file objections may constitute a waiver of any appellate rights.

>                                 Respectfully submitted,
>
>                                 s/ Amy Reynolds Hay
>                                 AMY REYNOLDS HAY
>                                 United States Magistrate Judge

Dated: 7 September, 2005

```
cc:   Hon. Terrence F. McVerry
      United States District Judge

      David A. Colecchia, Esquire
      542 Hamel Avenue
      Greensburg, PA 15601

      Christy C. Wiegand
      Assistant United States Attorney
      United States Attorney's Office
      700 Grant Street
      Suite 400
      Pittsburgh, PA 15219
```